# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x

In re:

NATIONAL DRY CLEANERS INC.
a Delaware corporation, <u>et al.</u>,[1]

       Debtors.

-------------------------------------------------------- x

:     Chapter 11

:     Case No. 08-11382 (CSS)

:     Jointly Administered

:     Objection Deadline for Sale Procedures: July 18, 2008 at 4:00 p.m.
:     Hearing Date for Sale Procedures: July 24, 2008 at 3:00 p.m.
:     Objection Deadline for Sale Motion: TBD
:     Hearing Date for Sale Motion: TBD

## <u>NOTICE OF MOTION</u>

TO:      (I) THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE; (II) THE DEBTORS' THIRTY (30) LARGEST UNSECURED CREDITORS ON A CONSOLIDATED BASIS; (III) COUNSEL TO PRUDENTIAL; (IV) ALL PARTIES WHO ARE KNOWN TO POSSESS OR ASSERT A SECURED CLAIM AGAINST THE STALKING HORSE ASSETS AND NON-STALKING HORSE ASSETS; (V) COUNSEL TO THE BUYER; (VI) THE INTERNAL REVENUE SERVICE; AND (VII) ALL PARTIES ENTITLED TO NOTICE UNDER LOCAL RULE 2002-1(B).

         **PLEASE TAKE NOTICE** that the debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>") have filed the attached **MOTION OF PRIDE CLEANERS, INC. FOR ORDERS: (A)(I)(1) APPROVING SALE PROCEDURES IN CONNECTION WITH SALE OF KANSAS CITY ASSETS IDENTIFIED IN THE ASSET PURCHASE AGREEMENT WITH USDC KANSAS CITY, INC., (2) APPROVING SALE PROCEDURES IN CONNECTION WITH SALE OF NON-STALKING HORSE ASSETS; (II) SCHEDULING A HEARING TO CONSIDER SALE OF ASSETS; (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING A BREAK-UP FEE TO USDC KANSAS CITY, INC., AND (V) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF THE STALKING HORSE ASSETS AND NON-STALKING HORSE ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, PURSUANT TO THE USDC AGREEMENT AND/OR KANSAS CITY SALE AGREEMENT, (II) AUTHORIZING AND APPROVING THE USDC AGREEMENT AND/OR KANSAS CITY SALE AGREEMENT, (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; (IV) PROVIDING FOR PAYMENT**

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: National Dry Cleaners Inc. (6722), DCI USA, Inc. (3721), DCI Management Group, Ltd. (a California corporation) (2299), DCI Management Group, Ltd. (an Arizona corporation) (7724), Al Phillips The Cleaner, Inc. (0976), Capitol Varsity, Inc. (9357), DryClean USA of South Carolina, Inc. (3822), DryClean U.S.A. Coastal, Inc. (3612), DryClean USA of Georgia, Inc. (1817), Tuchman Cleaners, Inc. (5121), DCI Management Group, Inc. (0277), and Pride Cleaners, Inc. (9852). The address for the Debtors is 11811 N. Tatum Blvd., #3031, Phoenix, Arizona 85028.

**OF SALE PROCEEDS TO SECURED LENDER; AND (V) GRANTING RELATED RELIEF** (the "Motion")[2] with the United States Bankruptcy Court for the District of Delaware.

**PLEASE TAKE FURTHER NOTICE** that responses to the Motion, if any, are required to be filed on or before **July 18, 2008 at 4:00 p.m. (ET)** (the "Objection Deadline") with the United States Bankruptcy Court, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801. At the same time, you must also serve a copy of the response upon the Debtors' undersigned counsel so as to be received on or before the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** THAT A HEARING ON THE MOTION WILL BE HELD ON **JULY 24, 2008 AT 3:00 P.M. (ET)**, BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 5TH FLOOR, COURTROOM NO. 6, WILMINGTON, DELAWARE 19801.

**PLEASE TAKE FURTHER NOTICE** that the court has not scheduled a date for the Auction of the Stalking Horse Assets and the Non-Stalking Horse Assets or a hearing to approve the sale of the Stalking Horse Assets and the Non-Stalking Horse Assets. You will receive notice of the date of the Auction for the Stalking Horse Assets and the Non-Stalking Horse Assets and the hearing to approve the sale of the Stalking Horse Assets and the Non-Stalking Horse Assets once set by the Court.

**PLEASE TAKE FURTHER NOTICE THAT** IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF DEMANDED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: July 11, 2008
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for the Debtors and
Debtors in Possession

---

[2]    Capitalized terms used, but not defined herein, shall have the meaning ascribed to them in the Motion.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------- x

In re:                                         :     Chapter 11
                                               :
NATIONAL DRY CLEANERS INC.                     :     Case No. 08-11382 (CSS)
a Delaware corporation, et al.,                :
                                               :     Jointly Administered
         Debtors.                              :
                                               :     **Objection Deadline for Sale Procedures: July 18, 2008 at 4:00 p.m.**
                                               :     **Hearing Date for Sale Procedures:  July 24, 2008 at 3:00 p.m.**
                                               :     **Objection Deadline for Sale Motion:  TBD**
---------------------------------------------- x     **Hearing Date for Sale Motion:  TBD**

## MOTION OF PRIDE CLEANERS, INC. FOR ORDERS: (A)(I)(1) APPROVING SALE PROCEDURES IN CONNECTION WITH SALE OF KANSAS CITY ASSETS IDENTIFIED IN THE ASSET PURCHASE AGREEMENT WITH USDC KANSAS CITY, INC., (2) APPROVING SALE PROCEDURES IN CONNECTION WITH SALE OF NON-STALKING HORSE ASSETS; (II) SCHEDULING A HEARING TO CONSIDER SALE OF ASSETS; (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING A BREAK-UP FEE TO USDC KANSAS CITY, INC., AND (V) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF THE STALKING HORSE ASSETS AND NON-STALKING HORSE ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, PURSUANT TO THE USDC AGREEMENT AND/OR KANSAS CITY SALE AGREEMENT, (II) AUTHORIZING AND APPROVING THE USDC AGREEMENT AND/OR KANSAS CITY SALE AGREEMENT, (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; (IV) PROVIDING FOR PAYMENT OF SALE PROCEEDS TO SECURED LENDER; AND (V) GRANTING RELATED RELIEF

Pride Cleaners, Inc. (the "Debtor" or "Pride Cleaners"), one of the above-

captioned debtors and debtors in possession (collectively, the "Debtors"),[1] hereby submits this

motion (the "Motion"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: National Dry Cleaners Inc. ("NDCI") (6722), DCI USA, Inc. (3721), DCI Management Group, Ltd. (a California corporation) (2299), DCI Management Group, Ltd. (an Arizona corporation) (7724), Al Phillips The Cleaner, Inc. (0976), Capitol Varsity, Inc. (9357), DryClean USA of South Carolina, Inc. (3822), DryClean U.S.A. Coastal, Inc. (3612), DryClean USA of Georgia, Inc. (1817), Tuchman Cleaners, Inc. (5121), DCI Management Group, Inc. (0277), and Pride Cleaners, Inc. (9852). The address for the Debtors is 11811 N. Tatum Blvd., #3031, Phoenix, Arizona 85028.

6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for

entry of orders substantially in the forms annexed hereto as <u>Exhibit A</u> and <u>Exhibit C</u>, approving

sale procedures and the sale of the assets of Pride Cleaners in the Kansas City, Kansas and

Kansas City Missouri metropolitan and surrounding area (the "<u>Motion</u>").  In support of this

Motion, the Debtors respectfully represent:

<strong>SUMMARY OF RELIEF REQUESTED[2]</strong>

1.      Through this Motion, the Debtor is seeking the authority to sell the assets

of Pride Cleaners related to the dry cleaning and laundry operations in the Kansas City, Kansas

and Kansas City, Missouri metropolitan and surrounding area (the "<u>Kansas City Region</u>")

pursuant to two separate sale procedures depending on whether or not the specific assets are

included in the stalking horse bid embodied in the terms of that certain Asset Purchase

Agreement dated as of July 9, 2008 by and between Pride Cleaners and USDC Kansas City, Inc.

(the "<u>USDC Agreement</u>").

2.      Prior to the Petition Date, Pride Cleaners actively marketed its assets

related to the Kansas City Region.  As a result of those efforts, Pride Cleaners and USDC Kansas

City, Inc. (the "<u>Buyer</u>") entered into the USDC Agreement for the sale of a substantial portion of

Pride Cleaners' assets in the Kansas City Region, including, but not limited, 1 central dry

cleaning and laundry plant, 17 leased "drop stores" and 7 leased stores with dry cleaning and

laundry equipment on site, the trade names used by Pride Cleaners in the Kansas City Region,

equipment, inventory, receivables and other assets related to the business operations (as more

specifically defined in Section 1.1 of the USDC Agreement, the "<u>Stalking Horse Assets</u>").  The

USDC Agreement, however, does not include all of Pride Cleaner's assets related to the Kansas

---

[2] Capitalized terms in this Summary shall have the meanings ascribed to them below in this Motion.

City Region. Specifically, not included are 19 leased "drop stores", 1 leased store with dry cleaning and laundry equipment on site, the equipment used in those stores, and certain inventory, receivables and other assets (collectively, the "Non-Stalking Horse Assets"). In an effort to maximize the value of the assets related to the Kansas City Region while at the same time minimizing the costs and potential delays associated therewith, the Debtors are proposing to dual track auctions related to the Stalking Horse Assets and the Non-Stalking Horse Assets. Accordingly, the Debtor is seeking approval of two different sale procedures; one with respect to the Stalking Horse Assets and the other with respect to the Non-Stalking Horse Assets.

3.      The Debtors have significant liquidity issues that necessitate prompt and orderly sale(s) of the Stalking Horse Assets and the Non-Stalking Horse Assets to preserve and maximize the going concern value of such assets. Absent a prompt sale(s) pursuant to the procedures and timelines proposed, the Debtors believe that the going concern value of the Stalking Horse Assets and Non-Stalking Horse Assets may be significantly compromised. Moreover, the USDC Agreement requires a closing on or before September 2, 2008.

4.      By this Motion, the Debtor requests entry of an order approving (i) the Stalking Horse Sale Procedures; (ii) scheduling the Sale Hearing and setting objection and bidding deadlines for the Stalking Horse Assets; (iii) approving the form and manner of notice of an auction on the Stalking Horse Assets; (iv) establishing deadlines for objections to the proposed assumption and assignment of the Executory Contracts and Leases designated in the USDC Agreement; (v) approving the Break-Up Fee, and (vi) granting related relief.

5.      The Debtor further requests entry of an order approving (i) the Non-Stalking Horse Sale Procedures (ii) scheduling the Sale Hearing and setting objection and bidding deadlines for the Non-Stalking Horse Assets; (iii) approving the form and manner of

notice of an auction on the Non-Stalking Horse Assets; (iv) establishing deadlines for objections to the proposed assumption and assignment of the Executory Contracts and Leases that are Non-Stalking Horse Assets; and (v) granting related relief.

6.     By this Motion, the Debtor also requests the entry of an order or orders (i) authorizing the sale or sales of the Stalking Horse Assets and Non-Stalking Horse Assets free and clear of liens, claims, encumbrances, and interests, pursuant to the USDC Agreement and/or Kansas City Sale Agreement; (ii) authorizing and approving the USDC Agreement and/or Kansas City Sale Agreement; (iii) approving the assumption and assignment of the designated Executory Contracts and Unexpired Leases; (iv) providing for the payment of proceeds from the sale(s) of the Stalking Horse Assets and Non-Stalking Horse Assets to Prudential in its capacity as the secured lender; and (v) granting related relief.

## JURISDICTION

7.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, 365, 503 and 507, as complemented by Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND

*A.     Introduction.*

8.     On July 7, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Debtors also jointly filed motions or applications seeking certain typical "first day" relief, including entry of an order to have the Debtors' chapter 11 cases jointly administered.

9.     The Debtors have continued in possession of their respective properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.     No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.

B.     *Overview of the Debtors' Businesses.*

11.     The Debtors own and operate the largest group of affiliated dry cleaners in the United States. One of the Debtors, Tuchman Cleaners, Inc., has had dry cleaning operations since 1956. The Debtors and their affiliates have operated under the trade names Best Cleaners, Pride Cleaners, DryClean USA, Al Phillips The Cleaner, and Tuchman Cleaners, among others.

12.     As of June 30, 2008, the Debtors operated 231 dry cleaning stores and 6 central dry cleaning and laundry plants in nine (9) states. Of the dry cleaning stores, 164 are "drop stores," meaning that the stores do not have dry cleaning or laundry equipment on site and 67 dry cleaning stores have the necessary equipment to perform dry cleaning and/or laundry services "on-site." On average, the Debtors dry clean and launder approximately 300,000 articles of clothes each week.

13.     As of June 30, 2008, the Debtors employed over 1,500 employees.

C.     *Debt Structure.*

14.     DELIA'S Cleaners Inc. (n/k/a NDCI) ("DELIA'S") was a party to a Securities Purchase and Revolving Credit Agreement with The Prudential Company of America ("Prudential") dated as of April 21, 1999 (the "Credit Agreement"). In early 2001, DELIA'S defaulted under the terms of the Credit Agreement when it failed to make a principal payment under the Credit Agreement that was due on April 21, 2001. In addition to the failure to make

the principal payment, DELIA'S was in violation of certain financial covenants under the Credit Agreement.

15.    On September 30, 2001, DELIA'S and Prudential entered into a recapitalization agreement whereby, among other things, the parties agreed to terminate the existing credit agreement and to enter into a new secured credit facility with Prudential as the lender. NDCI is the borrower and primary obligor under that certain Senior Note and Revolving Credit Agreement dated as of September 30, 2001 by and between Prudential and DELIA'S (as amended, the "Senior Note Agreement") and that certain Subordinated Note Agreement dated as of September 30, 2001 by and among Prudential and DELIA'S (as amended, the "Subordinated Note Agreement" and together with the Senior Note Agreement, as amended, the "Credit Facility").

16.    The Senior Note Agreement is comprised of (i) a 10.91% Senior Secured Term A Note in the principal amount of $16,000,000 due November 30, 2008; (ii) a Senior Floating Rate Secured Term B Note in the principal amount of $6,000,000 due November 30, 2008; and (iii) a Senior Floating Rate Secured Revolving Credit Note in the principal amount of $3,900,000 due November 30, 2006. The Subordinated Note Agreement is comprised of a 11% Senior Secured Subordinated Note in the principal amount of $11,500,000 due November 30, 2008. On April 13, 2007, NDCI and Prudential agreed to certain limited waivers and amended the terms of the Credit Facility (the "Credit Facility Amendment") to, among other things, extend the due dates for the 10.91% Senior Secured Term A Note, the Senior Floating Rate Secured Term B Note, the Senior Floating Rate Secured Revolving Credit Note, and the 11% Senior Secured Subordinated Note to December 31, 2010. The Credit Facility Amendment, in addition

to other waivers, reduced the revolver commitment under the Senior Floating Rate Secured Revolving Credit Note to $1,000,000.

17.     NDCI is the primary obligor under the Credit Facility and the indebtedness under the Credit Facility is guaranteed by each of the other Debtors. Prudential has asserted a lien on substantially all of the Debtors' assets. Prudential has not received principal or interest payments under the Credit Facility from the Debtors since September 2007. As of June 30, 2008, the amount owed to Prudential under the Credit Facility is approximately $34,600,000.

18.     For the year ending December 28, 2007, the net sales of the Debtors' operations, on a consolidated basis, was $70.2 million.

D.      *Events Leading to the Debtors' Bankruptcy Filing.*

19.     A variety of factors have led to the Debtors' current liquidity crisis and thus, the commencement of these chapter 11 cases. The dry cleaning industry is a highly competitive industry marked by over capacity with numerous competitors operating in virtually the same geographic location. Over the past few years, the Debtors have attempted to stay competitive, but have suffered from certain operational difficulties and lack of liquidity caused by, among other things, increased energy costs, landlord indemnification claims for legacy environmental remediation costs, claims asserted by state environmental agencies related to clean-up costs, the costs associated with environmental-related litigation, a decline in discretionary spending among the Debtors' core customers, and the general economic downturn. These issues have significantly hampered the Debtors' ability to service the debt under the Credit Facility and manage their trade debt.

20.     The Debtors have been actively attempting to address their financial and operating issues for the past several years. As the Debtors reviewed their financial issues and the

7

available alternatives, it became apparent that the liquidation of their assets through prompt and orderly sales within chapter 11 was the best option for the Debtors to maximize the value of their businesses.

21. The Debtors have commenced these chapter 11 cases in order to maintain and preserve their assets and to market their businesses and consummate sales of assets, as soon as practicable, to maximize recoveries. Prior to commencing these cases, the Debtors marketed their assets which has resulted in certain expressions of interest for various assets and components of their businesses. The marketing efforts are continuing with the assistance of the Debtors' investment banker. However, due to their liquidity constraints, the contemplated sale transactions could not be consummated prior to the Petition Date. Accordingly, the Debtors have filed these chapter 11 cases to maximize the value of their assets through orderly sales for the benefit of their stakeholders.

## THE PROPOSED SALES

22. Pursuant to a purchase agreement or such other agreement(s) as the Debtor may enter into with respect to the Stalking Horse Assets or the Non-Stalking Horse Assets (a "Kansas City Sale Agreement"), the Debtor proposes to sell, assign and transfer the Stalking Horse Assets and the Non-Stalking Horse Assets, to the Successful Bidder(s) (defined below), free and clear of all liens, claims, encumbrances and other interests other than those expressly assumed by the Successful Bidder(s). Any such interests against or in the Stalking Horse Assets or the Non-Stalking Horse Assets will attach to the proceeds of the respective sales, in the order of priority and with the same validity, force and effect that such interest may now have against such assets. The sale or sales of the Stalking Horse Assets and the Non-Stalking Horse Assets are subject to the Court's approval and the auction process proposed herein.

DB02:6906147.6                                                        067391.1001

23.    The Debtors believe that the sale of the Stalking Horse Assets contemplated by the Stalking Horse Sale Procedures (as defined below) and the sale of the Non-Stalking Assets contemplated by the Non-Stalking Horse Sale Procedures (as defined below) will maximize the value of their estates for the benefit of their creditors and other interested parties.

A.    *Sale of Stalking Horse Assets Pursuant to the USDC Agreement*

24.    Prior to the Petition Date, Pride Cleaners extensively marketed and pursued the sale of the assets related to the Kansas City Region. As a result of those efforts and after significant negotiations, Pride Cleaners and the Buyer entered into the USDC Agreement for the purchase of the Stalking Horse Assets. The significant terms of the USDC Agreement, a copy of which is annexed hereto as Exhibit B, are:[3]

(a)    Acquired Assets: As set forth more fully in Section 1.1 of the USDC Agreement, the Buyer will acquire (i) Pride Cleaners' right, title and interest (including, without limitation, the amount of any security or similar deposit) (a) as lessee under the Real Property Leases described on Exhibit A-1 to the USDC Agreement as assumed by the Buyer under Section 2.3 of the USDC Agreement, (b) as lessee under the Other Leases identified on Exhibit A-2 to the USDC Agreement, and (c) as a party to the Other Contracts identified on Exhibit A-3 to the USDC Agreement; (ii) any improvements located on any Real Property occupied by Pride Cleaners under the Real Property Leases, but only to the extent, if any, of Pride Cleaner's interest in the Improvements; (iii) all the equipment, vehicles and tangible Personal Property owned by Pride Cleaners identified on Exhibit B to the USDC Agreement and any other tangible personal property acquired by Pride Cleaners exclusively for use in connection with the Business after July 9, 2008 but prior to the Closing Date; (iv) all Intangible Property owned or held by Pride Cleaners, including Trade Names, domain names, websites and the items identified on Exhibit C to the USDC Agreement; (v) all accounts receivable arising out of the operation of the Business; and (vi) all Inventory.

---

[3]    The following description of the USDC Agreement is a summary of the terms set forth in the USDC Agreement annexed hereto as Exhibit B. Capitalized terms used but not defined in this section have the meanings ascribed to them in the USDC Agreement. To the extent that this summary differs in any way from the terms set forth in the USDC Agreement, the terms of the USDC Agreement shall control.

(b)    Excluded Assets:  As set forth more fully in Section 1.2 of the USDC Agreement, Excluded Assets include (i) those items expressly excluded pursuant to the provisions of Section 1.1 of the USDC Agreement; (ii) all cash and cash equivalents; (iii) Inventory transferred or used by Pride Cleaners in the ordinary course of the Business prior to the Closing Date; (iv) any Contract terminated or expired prior to the Closing Date in accordance with its terms or in the ordinary course of the Business; (v) any right, property or asset listed on Exhibit D to the USDC Agreement; (vi) all claims, cross claims, and causes of action of Pride Cleaners, including, without limitation, all claims and causes of action arising under sections 542-553 of the Bankruptcy Code; (vii) all insurance, utility and tax deposits or refunds owing to Pride Cleaners; (viii) Pride Cleaners' rights under the USDC Agreement and all cash and non-cash consideration payable or deliverable to Pride Cleaners pursuant to the terms and provisions of the USDC Agreement; (ix) any Contract which is not assigned to, or assumed by, the Buyer at the Closing; and (x) any other asset, tangible or intangible, which is not acquired by the Buyer at the Closing.  The Buyer shall have the right, exercisable in its sole discretion at any time prior to the Bankruptcy Court hearing to consider the Approval Order, to designate any of the Real Property Leases and any of the Other Leases and Contracts as Excluded Assets.

(c)    Purchase Price:  $3,000,000, subject to the adjustment as provided in Sections 2.1.2, 2.2, 2.5.1 and 2.5.2 the USDC Agreement.[4]

(d)    Assumed Liabilities:  All obligations of Pride Cleaners under the Real Property Leases and Other Leases and Contracts that are assigned to, and assumed by, the Buyer on the Closing Date arising from and after the Closing Date; provided, however, that Assumed Liabilities shall include obligations for any environmental liabilities arising prior to the Closing Date with respect to any Identified Locations with respect to which the Buyer and Pride Cleaners agree to a Purchase Price reduction pursuant to Section 2.5.1. of the USDC Agreement.

---

[4]  Sections 2.1.2, 2.2, 2.5.1 and 2.5.2 of the USDC Agreement contemplate potential reductions in the purchase price, including, without limitation, in the event cure amounts exceed a certain level and as a result certain unexpired leases or executory contracts are excluded from the sale and/or certain consents/extensions from landlords are not obtained.  In some cases, the price reduction is calculated by formula and in others the reduction will be an amount agreed upon between the Buyer and Debtor.  In certain, but not all, cases, the Debtor and the Buyer have an understanding of how they intend to proceed if these contingencies occur and/or consents are not obtained.  Once the Debtor communicates with the parties from whom consents are required to determine whether acceptable consents can be obtained and/or determines whether cure amounts will exceed the level provided for in the USDC Agreement, the Debtor will supplement this Motion to reflect the actual amount of purchase price reduction, if any, that will result therefrom.

(e)     Cure Claims.  With respect to each of the Real Property Leases and Other Leases and Contracts assigned to the Buyer on the Closing Date, except as otherwise provided in the USDC Agreement, including, without limitation, Section 5.1, and Section 2.5.2, Pride Cleaners shall satisfy on or before the Closing Date, all Liabilities or obligations thereunder (i) accruing or arising prior to or on the Closing Date; or (ii) arising from or relating to any act, event or occurrence on or prior to the Closing Date (including, without limitation, Liability or obligation for breach, misfeasance, or under any other theory relating to Seller's conduct, performance or non-performance), that are required to be paid pursuant to section 365 of the Bankruptcy Code in order to assume and assign the Real Property Leases and Other Leases and Contracts to the Buyer, and to maintain any and all options thereunder to remain in force and effect.  The Real Property Leases and the Other Leases and Contracts shall be assigned to the Buyer, pursuant to the Approval Order, free and clear of all Cure Claims.  Notwithstanding the foregoing, Pride Cleaners shall not be required to satisfy Cure Claims to the extent Cure Claims exceed $250,000, provided, however, that any amounts payable by Pride Cleaners, or Purchase Price reductions, pursuant to Section 2.5.1 or Section 2.5.2 shall not be considered Cure Claims for purposes of calculating the Maximum Cure Amount.

(f)     Prorations:  Rent, taxes, utilities and prepaid expenses shall be prorated between Pride Cleansers and the Buyer as of the Closing Date.  All obligations due in respect of periods prior to and including the Closing Date shall be the obligations of Pride Cleaners, and all obligations due in respect of periods after the Closing Date shall be the obligations of and shall be paid in full or otherwise satisfied by the Buyer.  Rent shall be prorated on the basis of a thirty (30) day month.

(g)     Access to Records:  So long as Pride Cleaners' Chapter 11 bankruptcy case is pending, following the Closing, (i) the Buyer shall provide Pride Cleaners' counsel and other professionals employed in the Bankruptcy Case with reasonable access to the financial and other books and records relating to the Acquired Assets (whether in documentary or data form) for the purpose of the continuing administration of the Bankruptcy Case (including, without limitation, the pursuit of any avoidance, preference or similar actions), which access shall include (a) the right of such professionals to copy, at Pride Cleaners' expense, such documents and records as they may request in furtherance of the purposes described above, and (b) the Buyer's copying and delivering to Pride Cleaners or its professionals such documents or records as they may request, but only to the extent Pride Cleaners or its

11

professionals furnishes the Buyer with reasonably detailed written descriptions of the materials to be so copied and Pride Cleaners reimburses the Buyer for the reasonable costs and expenses thereof upon the terms and conditions set forth in Section 9.2 of the USDC Agreement.

(h) <u>Deposit</u>: $150,000.

(i) <u>Break-Up Fee and Bid Procedures</u>: As provided in Section 8.3.1(i), the Break-Up Fee is equal to $100,000 and any overbid is required to be for consideration of at least $200,000 more than the consideration to be paid by the Buyer under the USDC Agreement.

(j) <u>Closing Date</u>: No later than September 2, 2008.

25.     The Debtor proposes that the net proceeds realized from the sale of the Stalking Horse Assets be paid to Prudential, subject to the terms of the Interim Order Pursuant to Sections 105(a), 362, and 363 of the Bankruptcy Code Authorizing Use of Cash Collateral and Granting Related Relief [D.I. 22], including any final order authorizing the Debtors' use of cash collateral (the "Cash Collateral Order").

B.     *Stalking Horse Sale Procedures*

26.     The Debtor is proposing the sale procedures for the Stalking Horse Assets, which are annexed as Exhibit 1 to the Sale Procedures Order (the "Stalking Horse Sale Procedures"), in an attempt to maximize the realizable value of the Stalking Horse Assets for the benefit of the Debtors' estates, creditors and other interested parties. The Stalking Horse Sale Procedures contemplate an auction process pursuant to which bids for all or a portion of the Stalking Horse Assets will be subject to higher or better offers. As described below and more fully in the Stalking Horse Sale Procedures, only Qualified Bidders who timely submit Qualified

Bids will be eligible to participate in the Stalking Horse Auction. Specifically, the Stalking Horse Sale Procedures provide, in relevant part, as follows:[5]

(a)   Participation Requirements: In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in the Stalking Horse Assets (a "Potential Bidder") must first deliver the following materials to the Debtors and their counsel: (i) an executed confidentiality agreement in form and substance satisfactory to the Debtor and its counsel; (ii) the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of a sale transaction, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is reasonably acceptable to the Debtor and its counsel and (y) the written commitment reasonably acceptable to the Debtor and its counsel of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with a sale transaction provided that if a Potential Bidder is unable to provide Financials, the Debtor may accept such other information sufficient to demonstrate to the Debtor's reasonable satisfaction that such Potential Bidder has the financial wherewithal to consummate a sale transaction.

(b)   Bid Deadline. Seven (7) business days prior to the scheduled Sale Hearing.

(c)   Qualified Bid. A bid (other than the USDC Agreement) must be a written irrevocable offer from a Qualified Bidder and (i) state that the Qualified Bidder offers to consummate the Sale pursuant to an agreement that has been marked to show amendments and modifications to the USDC Agreement, including price, assets to be purchased, and terms, that are being proposed by the Qualified Bidder, as applicable, (the "Marked Purchase Agreement"); (ii) equal or exceed the consideration being paid by the Buyer pursuant to the USDC Agreement by the sum of (1) the $100,000 Break-Up Fee, and (2) $100,000; (iii) contain a list of the Debtor's executory contracts and unexpired leases related to the Kansas City Region with respect to which the bidder seeks assignment from the Debtor (which may include some or all of the contracts and leases included in the USDC Agreement and some or all of the excluded contracts and leases related to the Kansas City Region not included in the USDC Agreement); (iv) confirm that the offer shall remain open and irrevocable until the entry of a final non-appealable order by the Bankruptcy Court approving the Sale to the Successful Bidder; (v) enclose a copy of the proposed Marked Purchase Agreement; (vi) be accompanied with a certified or bank check or wire transfer in an amount equal to $150,000 as

---

[5]   The following description of the Stalking Horse Sale Procedures is a summary of the terms set forth in the Stalking Horse Sale Procedures annexed hereto as Exhibit 1. Capitalized terms used but not defined in this section have the meanings ascribed to them in the Stalking Horse Sale Procedures. To the extent that this summary differs in any way from the terms set forth in the Stalking Horse Sale Procedures, the terms of the Stalking Horse Sale Procedures shall control.

a minimum good faith deposit (the "Minimum Deposit"), which Minimum Deposit shall be used to fund a portion of the purchase price provided for in the bid; (vii) be on terms that are not materially more burdensome or conditional than the terms of the USDC Agreement; (viii) not be conditioned on obtaining financing or the outcome of any due diligence by the Qualified Bidder; (ix) not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment; and (x) fully disclose the identity of each entity that will be bidding for the Stalking Horse Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

A Qualified Bid must include at least a portion of the Stalking Horse Assets, and may include other assets of Pride Cleaners related to the Kansas City Region that are not Stalking Horse Assets.

(d)     Auction. If a Qualified Bid by a Qualified Bidder is received by the Bid Deadline (other than the USDC Agreement), an auction (the "Stalking Horse Auction") with respect to a sale of the Stalking Horse Assts shall take place on **August [____], 2008 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, or such other place and time as the Debtor shall notify all Qualified Bidders, the Committee, Prudential, and other invitees. If, however, no such Qualified Bid is received by the Bid Deadline, then the Stalking Horse Auction will not be held.

(e)     Auction Rules. Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Stalking Auction. At the Stalking Horse Auction, Qualified Bidders will be permitted to increase their bids. The bidding at the Stalking Horse Auction shall start at the purchase price stated in the highest or otherwise best Qualified Bid as disclosed to all Qualified Bidders prior to commencement of the Kansas City Stalking Horse Auction (the "Starting Qualified Bid"), and then continue in increments of $75,000.

(f)     Sale Hearing. Prior to August 29, 2008

(g)     Acceptance of the Successful Bid(s). If a Stalking Horse Auction is held, the Debtor shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Stalking Horse Auction and (ii) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of an Order approving such Successful Bid.

(h)     Return of Deposit. Except as otherwise provided in this paragraph with respect to any Successful Bid and any Next Highest Bid, the Minimum Deposits of all Qualified Bidders required to submit such a deposit under the Stalking Horse Sale Procedures shall be returned upon or within one (1) business day after entry of an order approving the sale of the Stalking Horse Assets. The Minimum Deposit of

the Successful Bidder shall be held until the closing of the Sale of the Stalking Horse Assets and applied in accordance with the Successful Bid. To the extent a Qualified Bidder elects to serve as the Next Highest Bidder, the Minimum Deposit of the Next Highest Bidder shall be returned upon or within one (1) business day after closing of the Sale of the Stalking Horse Assets to the Successful Bidder. If the Successful Bidder fails to close such Sale, such party's Minimum Deposit shall be forfeited to the Debtor.

(i)     <u>Reservation of Rights</u>. The Debtor reserves the right to seek approval of the Sale of portions of the Stalking Horse Assets through separate purchase agreements with different purchasers in the event that the combination of such Sales is determined by the Debtor, in its sole discretion, to obtain the highest value for the Stalking Horse Assets. Except as otherwise provided in the USDC Agreement or the Kansas City Sale Procedures Order, the Debtor further reserves the right as they may reasonably determine to be in the best interests of its estate, in consultation with Prudential, to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal, (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Stalking Horse Sale Procedures or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtor and its estate; (v) remove some or all of the Stalking Horse Assets from the Stalking Horse Auction, (vi) waive terms and conditions set forth herein with respect to all potential bidders, (vii) impose additional terms and conditions with respect to all potential bidders, (viii) extend the deadlines set forth herein, (x) adjourn or cancel the Stalking Horse Auction and/or Sale Hearing in open court without further notice; and (xi) modify the Stalking Horse Sale Procedures as they may determine to be in the best interests of its estate or to withdraw the Motion at any time with or without prejudice.

C.     *Sale or Sales of Non-Staling Horse Assets*

27.     Although the sale of the Stalking Horse Assets through the terms of the USDC Agreement contemplates the sale of a substantial portion of Pride Cleaners' assets related to the business operations in the Kansa City Region, certain assets are not being purchased by the Buyer. Accordingly, in an effort to maximize the value of the Debtor's assets and minimize costs and delay associated with such efforts, the Debtor proposes to sell the Non-Stalking Horse Assets to the Successful Bidder(s) pursuant to the terms of a Kansas City Agreement, substantially in the form annexed to the Non-Stalking Horse Sale Procedures as <u>Exhibit A</u>.

DB02:6906147.6                                     067391.1001

28.     The Debtors propose that the net proceeds realized from the sale of the

Non-Stalking Horse Assets be paid to Prudential, subject to the terms of the Cash Collateral

Order.

<em>D.     Non-Stalking Horse Sale Procedures</em>

29.     The Debtor is proposing the sale procedures for the Non-Stalking Horse

Assets, which are annexed as <u>Exhibit 2</u> to the Sale Procedures Order (the "<u>Non-Stalking Horse</u>

<u>Sale Procedures</u>"), in an attempt to maximize the realizable value of the Non-Stalking Horse

Assets for the benefit of the Debtor's estate, creditors and other interested parties.  The Non-

Stalking Horse Sale Procedures apply only to bids that do not include any Stalking Horse Asset.

Put differently, if a party submits a bid on a lease or other asset that is a Stalking Horse Asset,

the Stalking Horse Sale Procedures apply to such bid, not the Non-Stalking Horse Sale

Procedures.

30.     The Non-Stalking Horse Sale Procedures contemplate an auction process

pursuant to which bids for all or a portion of the Non-Stalking Horse Assets will be subject to

higher or better offers.  As described below and more fully in the Non-Stalking Horse Sale

Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to

participate in the Non-Stalking Horse Auction.  Specifically, the Non-Stalking Horse Sale

Procedures provide, in relevant part, as follows:[6]

(a)     <u>Participation Requirements</u>:  In order to participate in the bidding process or
otherwise be considered for any purpose hereunder, a person interested in the
Non-Stalking Horse Assets (a "<u>Potential Bidder</u>") must first deliver the following
materials to the Debtor and its counsel: (i) an executed confidentiality agreement

---

[6]     The following description of the Non-Stalking Horse Sale Procedures is a summary of the terms set forth in
the Non-Stalking Horse Sale Procedures annexed hereto as <u>Exhibit 2</u>.  Capitalized terms used but not defined in this
section have the meanings ascribed to them in the Non-Stalking Horse Sale Procedures.  To the extent that this
summary differs in any way from the terms set forth in the Non-Stalking Horse Sale Procedures, the terms of the
Non-Stalking Horse Sale Procedures shall control.

in form and substance satisfactory to the Debtor and its counsel; (ii) the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of a sale transaction, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is reasonably acceptable to the Debtor and its counsel and (y) the written commitment reasonably acceptable to the Debtor and its counsel of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with a sale transaction provided that if a Potential Bidder is unable to provide Financials, the Debtor may accept such other information sufficient to demonstrate to the Debtor's reasonable satisfaction that such Potential Bidder has the financial wherewithal to consummate a sale transaction.

(b)     Bid Deadline.  Seven (7) business days prior to the scheduled Sale Hearing.

(c)     Qualified Bid.  A bid must be a written irrevocable offer from a Qualified Bidder and: (i) state that the Qualified Bidder offers to consummate the Sale pursuant to an agreement that has been marked to show amendments and modifications to the form purchase agreement annexed as Exhibit A to the Non-Stalking Horse Sale Procedures, including price and terms, that are being proposed by the Qualified Bidder, as applicable, (the "Marked Purchase Agreement"); (ii) confirm that the offer shall remain open and irrevocable until the closing of a Sale to the Successful Bidder or the Next Highest Bidder; (iii) enclose a copy of the proposed Marked Purchase Agreement; (iv) the Marked Purchase Agreement must specifically identify the assets proposed to be purchased, which may be all or a portion of the Non-Stalking Horse Assets; (v) contain a list of the Debtor's executory contracts and unexpired leases related to the Non-Stalking Horse Assets with respect to which the bidder seeks assignment from the Debtor; (vi) the Marked Purchase Agreement must provide that the bidder will pay all cure costs associated with the executory contracts and unexpired leases identified for assumption and assignment to the bidder (except that it may exclude rent for the month of July 2008 and amounts owing under such executory contracts and unexpired leases for the period from the Petition Date through the closing date of the sale transaction); (vii) be accompanied by a certified or bank check or wire transfer in an amount equal to the greater of $15,000 or 10% of the purchase price identified in the Marked Purchase Agreement as a minimum good faith deposit (the "Minimum Deposit"), which Minimum Deposit shall be used to fund a portion of the purchase price provided for in the bid; (viii) the Marked Purchase Agreement must provide that the sale of the Non-Stalking Horse Assets shall close on or before September 15, 2008, unless otherwise agreed to by the Debtor; (ix) be on terms that are not materially more burdensome or conditional than the terms of the Purchase Agreement; (x) not be conditioned on obtaining financing or the outcome of any due diligence by the Qualified Bidder; (xi) not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment; and (xii) fully disclose the identity of each entity that will be bidding for the Non-Stalking Horse Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

17

(d)     Auction.  If the Debtor receives a Qualified Bid from a Qualified Bidder by the Bid Deadline, an auction (the "Non-Stalking Horse Auction") with respect to the Sale of the Non-Stalking Horse Assets will take place on **August [___], 2008 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19899, or such later time and place as the Debtor shall notify all Qualified Bidders, the Committee, Prudential and other invitees.  If only one Qualified Bid is received by the Bid Deadline for a portion or all of the Non-Stalking Horse Assets, the Auction will be deemed cancelled and that Qualified Bid, if it is otherwise acceptable to the Debtor, will be deemed the Successful Bid for the Non-Stalking Horse Assets identified in the Marked Purchase Agreement, and the Debtor will seek authority from the Bankruptcy Court to consummate the Sale contemplated by the Qualified Bid.

(e)     Auction Rules.  If an Auction is held, the following rules for its conduct (the "Non-Stalking Horse Auction Rules") shall be observed: (i) only a Qualified Bidder who has submitted a Qualified Bid by the Bid Deadline will be eligible to participate at the Auction; (ii) at the Non-Stalking Horse Auction, Qualified Bidders will be permitted to increase their bids; (iii) the bidding at the Non-Stalking Horse Auction shall start at the purchase price stated in the Initial Bid and then continue in increments as determined by the Debtor and announced at the commencement of the auction, provided the bidding increments shall not be more than 10% of the Initial Bid for such assets; (iv) each Qualified Bidder will be permitted a fair, but limited, amount of time (no more than fifteen minutes, unless otherwise agreed by the Debtor) to respond to the previous bid at the Non-Stalking Horse Auction.  Bidding at the Non-Stalking Horse Auction will continue until such time as the highest or otherwise best offer is determined in accordance with these Non-Stalking Horse Sale Procedure; (v) the Debtor will, from time to time, in an open forum, advise Qualified Bidders participating in the Non-Stalking Horse Auction of the then highest or otherwise best bid(s); (vi) the Non-Stalking Horse Auction may be adjourned by the Debtor.  Reasonable notice of the time and place for the resumption of the Non-Stalking Horse Auction will be given to all Qualified Bidders, the Official Committee of Unsecured Creditors if one has been appointed, Prudential, and other invited parties; (vii) immediately prior to concluding the Non-Stalking Horse Auction, the Debtor shall, in consultation with Prudential, (a) review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the Sale process and the best interests of the Debtor's estate and creditors; (b) determine and identify the highest or otherwise best Qualified Bid (the "Successful Bid") and the Qualified Bidder submitting such bid (the "Successful Bidder"); (c) determine and identify the next highest or otherwise best Qualified Bid after the Successful Bid (the "Next Highest Bid") and the Qualified Bidder submitting such bid (the "Next Highest Bidder"); and (d) have the right to reject any and all bids; and (viii) within one business day of the completion of the Non-Stalking Horse Auction, the Successful Bidder shall complete and execute all agreements, instruments, or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

18

(f)     <u>Sale Hearing</u>. Prior to August 29, 2008

(g)     <u>Acceptance of the Successful Bid(s)</u>. If a Non-Stalking Horse Auction is held, the Debtor shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction and (ii) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of an Order approving such Successful Bid.

(h)     <u>Return of Deposit</u>. Except as otherwise provided in this paragraph with respect to any Successful Bid and any Next Highest Bid, the Minimum Deposits of all Qualified Bidders required to submit such a deposit under the Sale Procedures shall be returned upon or within one (1) business day after the entry of an order approving the sale of the Non-Stalking Horse Assets for which such Minimum Deposit relates. The Minimum Deposit of the Successful Bidder shall be held until the closing of the Sale of such Non-Stalking Horse Assets and applied in accordance with the Successful Bid. The Minimum Deposit of the Next Highest Bidder shall be returned upon or within one (1) business day after closing of the Sale of Non-Stalking Horse Assets to the Successful Bidder. If the Successful Bidder fails to close the Sale, such party's Minimum Deposit shall be forfeited to the Debtor.

(i)     <u>Reservation of Rights</u>. The Debtor reserves the right to seek approval of the Sale of portions of the Non-Stalking Horse Assets through separate Purchase Agreements with different purchasers in the event that the combination of such Sales is determined by the Debtor, in its sole discretion, to obtain the highest value for the Non-Stalking Horse Assets. The Debtor further reserves the right as it may reasonably determine to be in the best interests of its estates, in consultation with Prudential, to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal, (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Non-Stalking Horse Sale Procedures, the Kansas City Sale Procedures Order or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtor and its estate; (v) remove some or all of the Non-Stalking Horse Assets from the Non-Stalking Horse Auction, (vi) enter into one or more stalking horse agreements and seek Court approval of expense reimbursements and/or break-up fees with respect to the Non-Stalking Horse Assets; (vii) waive terms and conditions set forth herein with respect to all potential bidders, (viii) impose additional terms and conditions with respect to all potential bidders, (ix) extend the deadlines set forth herein, (x) adjourn or cancel the Kansas City Non-Stalking Horse Auction and/or Sale Hearing in open court without further notice; and (xi) modify the Kansas City Non-Stalking Horse Sale Procedures as it may determine to be in the best interests of its estate or to withdraw the Motion at any time with or without prejudice.

19

## RELIEF REQUESTED

31.     By this Motion, the Debtor seeks the entry of an order, substantially in the form annexed hereto as Exhibit A (the "Kansas City Sale Procedures Order"), (i) approving the Stalking Horse Sale Procedures and Non-Stalking Horse Sale Procedures; (ii) scheduling a sale hearing with respect to the Stalking Horse Assets and Non-Stalking Horse Assets (the "Sale Hearing") and establishing related deadlines; (iii) approving the form and manner of notice of the Stalking Horse Sale Procedures, the Non-Stalking Horse Sale Procedures, the auctions contemplated therewith and the Sale Hearing; (iv) approving the Break-Up Fee; and (v) granting related relief.

32.     The Debtor additionally, by this Motion, seeks the entry of order(s) in substantially the form of the order annexed hereto as Exhibit C (the "Kansas City Sale Order");[7] (i) authorizing the sale of the Stalking Horse Assets and Non-Stalking Horse Asset free and clear of liens, claims, encumbrances, and interests, pursuant to the USDC Agreement and/or Kansas City Sale Agreement(s); (ii) authorizing and approving the USDC Agreement and/or Kansas City Sale Agreement(s); (iii) approving the assumption and assignment of the designated executory contracts and unexpired leases related thereto (collectively, the "Executory Contracts and Unexpired Leases"); (iv) providing for the payment of proceeds from the sale(s) of the Stalking Horse Assets and Non-Stalking Horse Assets to Prudential in its capacity as the secured lender; and (v) granting related relief.

---

[7]     In connection with the sale of Non-Stalking Horse Assets, the Debtors will modify the proposed Kansas City Sale Order to conform to the terms of such sale and will provide notice of the modified proposed Kansas City Sale Order to the Court and interested parties in advance of the hearing to consider such sale.

DB02:6906147.6                                                                              067391.1001

B.    <u>Notice of Auction and Sale Hearing</u>

33.    The Debtor requests that the Court schedule the Sale Hearing prior to August 29, 2008. The Debtor further requests that the objection deadline with respect to the sale of the Stalking Horse Assets and the Non-Stalking Horse Assts be seven business days prior to such hearing.

34.    On or before three (3) business days after entry of the Kansas City Sale Procedures Order, the Debtor will cause the notice attached as <u>Exhibit 3</u> to the Kansas City Sale Procedures Order (the "<u>Notice</u>"), the USDC Agreement and the Kansas City Sale Procedures Order to be sent by first-class mail postage prepaid, to the following: (i) the Office of the United States Trustee; (ii) counsel for the Buyer; (iii) counsel for Prudential; (iv) counsel for Committee, if and when appointed; (v) all entities known to have expressed a bona fide interest, within the last six months, in acquiring the Stalking Horse Assets and Non-Stalking Horse Assets; (vi) all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon the Stalking Horse Assets and the Non-Stalking Horse Assets; (vii) federal, state, and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the sale of the Stalking Horse Assets or the Non-Stalking Horse Assets, may have claims, contingent or otherwise, in connection with the Debtor's ownership of the Stalking Horse Assets or the Non-Stalking Horse Assts or have any reasonably known interest in the relief requested by the Motion; (viii) all parties, if any, who are known to claim interests in any Executory Contracts and Leases related to the Kansas City Region; (ix) the United States Attorney's office; (x) the Internal Revenue Service; and (xi) all parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of the entry of the Kansas City Sale Procedures Order. In addition to the foregoing, on

21

B.    <u>Notice of Auction and Sale Hearing</u>

33.    The Debtor requests that the Court schedule the Sale Hearing prior to August 29, 2008. The Debtor further requests that the objection deadline with respect to the sale of the Stalking Horse Assets and the Non-Stalking Horse Assts be seven business days prior to such hearing.

34.    On or before three (3) business days after entry of the Kansas City Sale Procedures Order, the Debtor will cause the notice attached as <u>Exhibit 3</u> to the Kansas City Sale Procedures Order (the "<u>Notice</u>"), the USDC Agreement and the Kansas City Sale Procedures Order to be sent by first-class mail postage prepaid, to the following: (i) the Office of the United States Trustee; (ii) counsel for the Buyer; (iii) counsel for Prudential; (iv) counsel for Committee, if and when appointed; (v) all entities known to have expressed a bona fide interest, within the last six months, in acquiring the Stalking Horse Assets and Non-Stalking Horse Assets; (vi) all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon the Stalking Horse Assets and the Non-Stalking Horse Assets; (vii) federal, state, and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the sale of the Stalking Horse Assets or the Non-Stalking Horse Assets, may have claims, contingent or otherwise, in connection with the Debtor's ownership of the Stalking Horse Assets or the Non-Stalking Horse Assts or have any reasonably known interest in the relief requested by the Motion; (viii) all parties, if any, who are known to claim interests in any Executory Contracts and Leases related to the Kansas City Region; (ix) the United States Attorney's office; (x) the Internal Revenue Service; and (xi) all parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of the entry of the Kansas City Sale Procedures Order. In addition to the foregoing, on

21

or before three (3) business days after entry of the Kansas City Sale Procedures Order, the Debtors will serve the Notice on all known creditors of Pride Cleaners, Inc.

35.     In addition, to facilitate the sale of the Stalking Horse Assets and the Non-Stalking Horse Assets and the assumption and assignment of the Executory Contracts and Leases, the Debtors shall serve a notice of potential assumption and assignment of the Executory Contracts and Leases (the "Assumption Notice") on all non-debtor parties to the Executory Contracts and Leases, on or before three (3) business days after the entry of the Kansas City Sale Procedures Order by first class mail or hand delivery.

36.     In the Assumption Notice, the Debtor will identify whether the Executory Contract and Lease is a Stalking Horse Asset or Non-Stalking Horse Assets and the calculation of the undisputed cure amounts that the Debtor believes must be paid to cure all defaults under the Executory Contracts and Leases (the "Cure Amounts"). If no amount is listed on the Assumption Notice to be served, the Debtor believes that there is no Cure Amount. The Debtor request that unless the non-debtor party to an Executory Contract files an objection (the "Cure Amount Objection") to its scheduled Cure Amount by 4:00 p.m. (prevailing Eastern time) three business days prior to the Bid Deadline (the "Cure Objection Deadline") and serves a copy of the Cure Amount Objection so as to be received no later than the Cure Objection Deadline on the same day to: (a) National Dry Cleaners Inc., 6970 W. 152nd Terrace, Overland Park, Kansas 66223 (Attn.: Kevin M. Lyng, Chief Executive Officer); (b) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn.: Joel A. Waite), counsel to the Debtors; (c) counsel to the Official Committee of Unsecured Creditors, if and when appointed (the "Committee"); (d) Alston & Bird LLP, One Atlantic Center, 1201 West :Peachtree Street, Atlanta, Georgia 30309-3424 (Attn.: Jason Watson),

22

counsel to Prudential; (e) Levene, Neale, Bender, Rankin & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California, 90067 (Attn: Martin J. Brill), counsel to the Buyer; and (f) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801; such non-debtor party should (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Lease and the Debtors shall be entitled to rely solely upon the Cure Amount; and (ii) if the Executory Contract and Lease was identified as a Stalking Horse Asset and the Buyer is the Successful Bidder, be deemed to have consented to the assumption and assignment of such Executory Contract and Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, the Buyer or such other successful bidder or any other assignee of the relevant Executory Contract and Lease that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Executory Contract.

37.    In the event that the Buyer is not the Successful Bidder for the Stalking Horse Assets and for those Executory Contracts and Leases identified in the Assumption Notice as Non-Stalking Horse Assets that are included in a Successful Bid, within one (1) business day after the conclusion of the auctions for the Stalking Horse Assets and the Non-Stalking Horse Assets, the Debtor will serve a notice identifying the Successful Bidders by overnight courier or facsimile to the non-Debtor parties to the Executory Contracts and Leases that have been identified in such Successful Bid. The Debtor proposes that the non-Debtor parties to the Executory Contracts and Leases have until 4:00 p.m. on the date that is two (2) business days prior to the Sale Hearing (the "Adequate Assurance Objection Deadline") to object to the assumption and assignment of such Executory Contract and Lease solely on the issue of whether

the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

C.    Break-Up Fee

38.    Section 8.3.2 of the USDC Agreement provides that in the event Pride Cleaners receives from a third party a higher or better offer at the auction on the Stalking Horse Assets and that offer is subsequently approved by Court and closes as provided by its terms, the Buyer will be entitled to receive $100,000 (the "Break-Up Fee") paid concurrently with the closing of the sale to such third party out of the sale proceeds. The Break-Up Fee may also be payable to the Buyer if, as provided in Section 2.1.2(c) of the USDC Agreement, the Purchase Price adjustments to be made pursuant to Section 2.1.2 or any other provision of the USDC Agreement result in a Purchase Price that is less than $2,400,000, and Pride Cleaners terminates the USDC Agreement and subsequently sells the assets of the Business for in excess of $2,400,000. The Break-Up Fee may also be payable to the Buyer if, as provided in Section 2.2 of the USDC Agreement, the USDC Agreement is terminated as a result of Pride Cleaners and the Buyer not agreeing to an adjusted Purchase Price in the event that Pride Cleaners excludes any one or more Locations (as defined in the USDC Agreement) from the Acquired Assets (as defined in the USDC Agreement) and the assets of the Business are sold by Pride Cleaners for an amount, net of any Cure Claims (as defined in the USDC Agreement), in excess of $2,400,000.

## AUTHORITY FOR REQUESTED RELIEF

D.    The Sale of the Stalking Horse Assets and the Non-Stalking Horse Assets is Within the Sound Business Judgment of the Debtors and Should be Approved

39.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the

24

Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

40.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtor submits that the decision to proceed with the Sale of the Stalking Horse Assets and the Non-Stalking Horse Assets and the Stalking Horse Sale Procedures and the Non-Stalking Horse Sale Procedures is based upon sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to

justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

41.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

42.     The Debtor submits that more than ample business justification exists to sell the Stalking Horse Assets and the Non-Stalking Horse Assets to the Successful Bidder(s) (or Next Highest Bidder(s)) pursuant to Stalking Horse Sale Procedures or the Non-Stalking Horse

DB02:6906147.6                                    067391.1001

Sale Procedures, as applicable. The Debtors have significant liquidity issues that necessitate prompt and orderly sale(s) of the Stalking Horse Assets and the Non-Stalking Horse Assets to preserve and maximize the going concern value of such assets. Absent a prompt sale(s) pursuant to the procedures and timelines proposed, the Debtors believe that the going concern value of the Stalking Horse Assets and Non-Stalking Horse Assets may be significantly compromised. The Debtors believe that a targeted sale process is most likely to achieve the highest and best price for the Stalking Horse Assets and the Non-Stalking Horse Assets. Furthermore, the Debtor believes that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of its estate for the benefit of its stakeholders.

43.    The notice described herein and in the Kansas City Sale Procedures Order are designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Stalking Horse Assets or the Non-Stalking Horse Assets. Accordingly, the proposed sale of the Stalking Horse Asset and the Non-Stalking Horse Assets satisfies the second prong of the Abbotts Dairies standard.

44.    The Debtors have been actively marketing their assets since January 2008. During the second quarter of 2008, the Debtors had numerous meetings with a series of potential purchasers, but such meetings did not result in a sale prior to the Petition Date. However, those meetings did serve as the basis for negotiating and ultimately entering into the USDC Agreement for the sale of the Stalking Horse Assets.

45.    To assist the Debtor in marketing the Stalking Horse Assets and Non-Stalking Horse Assets in these chapter 11 cases, the Debtors have retained, subject to Court approval, the joint venture of Hilco Corporate Finance LLC and Hilco Real Estate, LLC to act as the Debtors investment bankers in these chapter 11 cases. In addition to these marketing efforts,

the Kansas City Sale Procedures are designed to maximize the value received for Stalking Horse Assets and Non-Stalking Horse Assets. The process proposed by the Debtor allows for a timely auction process while providing bidders ample time and information to submit a timely bid. Along with the Debtors' ample marketing process, the Kansas City Sale Procedures are designed to ensure that the Stalking Horse Assets and Non-Stalking Horse Assets will be sold for the highest or otherwise best possible purchase price. The Debtor has and is subjecting the value of the Stalking Horse Assets and Non-Stalking Horse Assets to market testing and permitting prospective purchasers to bid on the Stalking Horse Assets and Non-Stalking Horse Assets. The proposed sale will be further subject to a market check through the solicitation of competing bids in a court-supervised auction process, as set forth in the Kansas City Sale Procedures. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Stalking Horse Assets and Non-Stalking Horse Assets will be fair and reasonable, and therefore the third prong of the Abbotts Dairies standard is satisfied. As discussed below, the "good faith" prong of the Abbotts Dairies standard is also satisfied here.

E.      The Proposed Sales are Proposed in "Good Faith"
        Under Section 363(m) of the Bankruptcy Code

            46.     The Debtor requests that the Court find that the Successful Bidder (or Next Highest Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Stalking Horse Assets and the Non-Stalking Horse Assets.

            47.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

28

11 U.S.C. § 363(m).

48.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Stalking Horse Assets and the Non-Stalking Horse Assets. Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365. Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d Cir. 1998). In Krebs, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." Id. at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in Krebs, the Executory Contracts and Leases (as defined below) are executory contracts that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. In light of Krebs, the Debtors respectfully submit that section 363(m) applies to protect the Successful Bidder(s) (or Next Highest Bidder(s)) with respect to both the Executory Contracts and Leases (as defined and described more fully below) and the Stalking Horse Assets and the Non-Stalking Horse Assets.

49.     As required by section 363(m) of the Bankruptcy Code, the Stalking Horse Sale Procedures and the Non-Stalking Horse Sale Procedures have been proposed in good faith

DB02:6906147.6                                        067391.1001

and provide for both the Debtor and the potential purchaser(s) to act in good faith in negotiating

the sale of the Stalking Horse Assets and the Non-Stalking Horse Assets and the assignment of

the Executory Contracts and Leases related thereto. Although the Bankruptcy Code does not

define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy

Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for

'value'." Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in

connection with the sale must usually amount to "fraud, collusion between the purchaser and

other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id.

(citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also In re

Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc.,

186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the

determination is based on the facts of each case, concentrating on the "integrity of [an actor's]

conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y.

1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

     50.    Here, the sale of the Stalking Horse Assets and the Non-Stalking Horse

Assets and the assignment of the Executory Contracts and Leases, which have been designated

by the Buyer in the USDC Agreement and/or designated by any Successful Bidder(s) in the

Kansas City Sale Agreement, is or will be in good faith. As discussed throughout this Motion,

and as will be further demonstrated at the Sale Hearing, the Kansas City Sale Agreement will be

the culmination of a solicitation and negotiation process in which all parties will be represented

by counsel. No known potential bidder for the Stalking Horse Assets and Non-Stalking Horse

Assets is an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy

Code, and all negotiations have been and will continue to be conducted on an arms length, good

                                               

faith basis. With respect to the potential bidders, the Stalking Horse Sale Procedures and the Non-Stalking Horse Sale Procedures are designed to ensure that no party is able to exert undue influence over the process. Under the circumstances, the Successful Bidder(s) (or Next Highest Bidder(s)) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser. Furthermore, the Stalking Horse Sale Procedures and the Non-Stalking Horse Sale Procedures are designed to prevent the Debtors or the Successful Bidder(s) (or Next Highest Bidder(s)) from engaging in any conduct that would cause or permit the Kansas City Sale Agreement(s), or the sale of the Stalking Horse Assets and the Non-Stalking Horse Assets to the Successful Bidder(s) (or Next Highest Bidder(s)) pursuant thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.

51.    All parties in interest will receive notice of the sales proposed herein and will be provided with an opportunity to be heard. Additionally, all counterparties to Executory Contracts and Assumed Leases will be provided notice of assumption and assignment and an opportunity to be heard. The Debtor submits that such notice is adequate for entry of the Kansas City Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

F.    The Proposed Sales Satisfy the Requirements
of Section 363(f) of the Bankruptcy Code

52.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or

interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for

such interest. 11 U.S.C. § 363(f); <u>Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)</u>, 94

B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in

the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the

subsections is met). Because the Debtor expects that it will satisfy the second and fifth of these

requirements, if not others as well, approving the sale of the Stalking Horse Assets and the Non-

Stalking Horse Assets free and clear of all adverse interests is warranted. Furthermore, courts

have held that they have the equitable power to authorize sales free and clear of interests that are

not specifically covered by section 363(f). <u>See</u>, <u>e.g.</u>, <u>In re Trans World Airlines, Inc.</u>, 2001 WL

1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); <u>Volvo White Truck Corp. v. Chambersburg</u>

<u>Beverage, Inc. (In re White Motor Credit Corp.)</u>, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

G.     Assumption and Assignment
       <u>of Executory Contracts and Unexpired Leases Should be Approved</u>

        53.     To facilitate and effectuate the sale of the Stalking Horse Assets and the

sale of the Non-Stalking Horse Assets, the Debtor seeks authority to assume and assign various

Executory Contracts and Leases to the Successful Bidder(s) (or the Next Highest Bidder(s)) to

the extent required by such Successful Bidder(s) (or Next Highest Bidder(s)). Section 365 of the

Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and

unexpired leases, subject to the approval of the Bankruptcy Court, provided that the defaults

under such contracts and leases are cured and adequate assurance of future performance is

provided. A debtor's decision to assume or reject an executory contract or unexpired lease must

only satisfy the "business judgment rule" and will not be subject to review unless such decision

is clearly an unreasonable exercise of such judgment. <u>Group of Institutional Investors v.</u>

<u>Chicago, Milwaukee, St. Paul & Pacific Ry. Co.</u>, 318 U.S. 523 (1943) (applying Bankr. Act

section 77 subsection (b), the predecessor to Bankruptcy Code Section 365 and rejecting the test of whether the executory contract was burdensome in favor of whether rejection is within the debtor's business judgment); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

54.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

55.     The Successful Bidder(s) (or the Next Highest Bidder) may desire to take assignment of certain executory contracts and unexpired leases related to the Stalking Horse Assets or the Non-Stalking Horse Assets.  To the extent Executory Contracts and Leases are identified for assumption and assignment by the Successful Bidder(s) (or the Next Highest Bidder(s)), the Debtor believes that it can and will demonstrate that all requirements for assumption and/or assignment of the Executory Contracts and Leases will be satisfied at the Sale Hearing.  The Debtor, as required by the Stalking Horse Sale Procedures and the Non-Stalking Horse Sale Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for Stalking Horse Assets and Non-Stalking Horse Assets.

33

Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Stalking Horse Assets and the Non-Stalking Horse Assets and assuming and assigning to the Successful Bidder(s) (or the Next Highest Bidder(s)) the Executory Contracts and Leases would be in the best interests of their estates. Moreover, the Debtor will provide all parties to the Executory Contracts and Leases an opportunity to be heard.

56.     Specifically, the Debtor will serve the Assumption Notice on or before three business days after entry of the Kansas City Sale Procedures Order on the non-Debtor parties to the Executory Contracts and Leases. The Assumption Notice will, among other things, identify whether the Executory Contract and Lease is a Stalking Horse Asset or Non-Stalking Horse Assets and respective Cure Amounts, if any. The Debtor requests that unless the non-debtor party to an Executory Contract and Lease files and serves a Cure Amount Objection on or before the Cure Objection Deadline such non-debtor party should (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Lease and the Debtor shall be entitled to rely solely upon the Cure Amount; and (ii) if the Executory Contract and Lease was identified as a Stalking Horse Asset and the Buyer is the Successful Bidder, be deemed to have consented to the assumption and assignment of such Executory Contract and Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, the Buyer or such other successful bidder or any other assignee of the relevant Executory Contract and Lease that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Executory Contract.

57.     In the event that the Buyer is not the Successful Bidder for the Stalking Horse Assets and for those Executory Contracts and Leases identified in the Assumption Notice

as Non-Stalking Horse Assets that are included in a Successful Bid (collectively, the "Non-Stalking Horse Executory Contracts and Leases"), within one (1) business day after the conclusion of the auctions for the Stalking Horse Assets and the Non-Stalking Horse Assets, the Debtor will serve a notice identifying the Successful Bidders by overnight courier or facsimile to the non-Debtor parties to the Non-Stalking Horse Executory Contracts and Leases that have been identified in such Successful Bid. The Debtor requests that objections by a non-Debtor party to the Non-Stalking Horse Executory Contracts and Leases to the assumption and assignment of such Non-Stalking Horse Executory Contract and Lease solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code be filed and served on or before the Adequate Assurance Objection Deadline.

58.     Thus, the Debtor requests that the assumption and assignment of the Executory Contracts and Leases should be approved.

H.     The Break-Up Fee is Reasonable and Appropriate

59.     Approval of the Break-Up Fee is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) ("In re O'Brien"). In In re O'Brien, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." In re O'Brien, 181 F.3d at 535. Here, the Break-Up Fee should be approved because it will provide a benefit to the Debtors' estates.

60.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, "[I]f the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

61.     In In re O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of break-up fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." See In re O'Brien, 181 F.3d at 536.

36

62.    Whether evaluated under the "business judgment rule" applied by many courts[8] or the Third Circuit's "administrative expense" standard, the Break-Up Fee should be approved. First, all negotiations between the Debtors and the Buyer have been conducted on a good faith, arm's-length basis. Second, based on the Debtors' pre-filing solicitation process, the Debtor has determined that the Break-Up Fee is necessary to attract and retain a stalking horse bidder. Specifically, the initial expressions of interest received by the Debtor from the Buyer indicated that the Buyer would not be willing to act as a stalking horse without some form of bid protection in the event the Debtor determined to sell the Stalking Horse Assets to another bidder. The Debtor's ability to continue to seek a higher or better offer without risk of losing a "bird-in-the-hand" would be eliminated if the Debtor could not secure a stalking horse bidder. Therefore, absent authorization of the payment of the Break-Up Fee, the Debtor may lose the opportunity to obtain the highest and best available offer for the Stalking Horse Assets.

63.    The Debtor submits that authorization of the Break-Up Fee will not chill the bidding (if any) for the Stalking Horse Assets. The Break-Up Fee was a negotiated item and the Debtor believes that the Break-Up Fee is appropriate under the circumstances because: (i) the Buyer is providing a substantial benefit to the estates by acting as a "stalking horse" bidder for the Stalking Horse Assets; (ii) the Stalking Horse Assets have been marketed to allow all known and potentially interested parties an adequate opportunity to offer better terms to the Debtor prior to the establishment of any bid protections; (iii) the USDC Agreement will provide a floor by which other bids may be judged; (iv) the Break-Up Fee afforded to the Buyer was a material inducement for the Buyer's entry into the USDC Agreement; and (v) the terms of the

---

[8]    See Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993).

USDC Agreement, including the bid protections, taken as a whole, amount to the highest and best offer for the Stalking Horse Assets in the Debtor's business judgment.

64. Moreover, the promise of a Break-Up Fee will ensure that the Debtor receives serious Qualified Bids. The Break-Up Fee will provide the incentive needed to induce a bidder to increase its bid prior to the auction for the Stalking Horse Assets. Further, the USDC Agreement with the Buyer will establish a bid standard or minimum for other bidders, further ensuring that during the auction the Debtor receives the highest or best bid possible for the Stalking Horse Assets. Accordingly, the higher the stalking horse bid, the higher the floor for bidding at the auction for the Stalking Horse Assets. Thus, even if the Buyer is offered the Break-Up Fee, and is ultimately not the Successful Bidder, the Debtor will still have benefited from the higher floor established by the improved bid and thereby increase the likelihood that the price at which the Stalking Horse Assets will be sold will reflect its true worth. Accordingly, to achieve the optimal bid at the auction on the Stalking Horse Assets, it is appropriate to offer the Break-Up Fee to the Buyer.

65. The Break-Up Fee is fair and reasonable in amount and well within market. First, paying the Break-up Fee of 3.33% of the $3,000,000 purchase price, which purchase price is subject to adjustment, on account of the Buyer's risk that the Debtor sells the Stalking Horse Assets to another bidder is reasonable and customary in this type of transaction. After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees as a percentage of the purchase price as being appropriate under the facts and circumstances of the case. See In re Chi-Chi's Inc., Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); In re Riverstone Networks, Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (fee of 3% permitted); In re Radnor Holdings, Case No. 06-

10894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3%

permitted); Tama Beef Packing, Inc., 312 B.R. 192 (Bankr. N.D. Iowa 2004) (court noted that

typical break-up fees are calculated at 3 to 4% of purchase price and upheld fee of 3.2%); In re

Great Kansas City Paper, Inc., Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of

5.4% plus reimbursement of expenses upheld); Integrated Resources, 147 B.R. 650, 662

(S.D.N.Y. 1992) (expert testified that outside of bankruptcy break-up fees average 3.3%); In re

Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. February 17, 1998)

(fee of 4.0% upheld); In re Hechinger Investment Company Inc., Case No. 99-2261 (PJW)

(Bankr. D. Del. October 1, 1999) (fee of 3.0% upheld); In re FSC Corp., Case No. 00-B-04659

(Bankr. N.D. Ill. February 28, 2000) (break-up fee of 3.4% plus reimbursement of expenses is

reasonable).

      66.     Second, payment of the Break-Up Fee is not likely to diminish the

Debtor's estate.  The Debtor will incur the obligation to pay the Break-Up Fee only if it receives

from a third party a higher or better offer on the Stalking Horse Assets and that offer is

subsequently approved by Court and closes as provided by its terms paid concurrently with the

closing of the sale to such third party out of the proceeds of such sale or if the USDC Agreement

is terminated as provided in Sections 2.1.1 or 2.2 and the assets are subsequently sold for a value

in excess of $2,400,000.  Finally, the Break-Up Fee was negotiated in good faith and was the

product of arm's-length negotiations.

      67.     The Debtor has demonstrated a sound business justification for

authorizing the Break-Up Fee and its clear necessity and benefit to these estates.  Thus, the

Debtor requests that this Court approve and authorize the Break-Up Fee.

DB02:6906147.6

067391.1001

I.    Relief from the Ten-Day Waiting Periods
      Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

68.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Kansas City Sale Procedures Order and the Kansas City Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

69.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

70.    Accordingly, the Debtor hereby requests that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

DB02:6906147.6                                                 067391.1001

## NOTICE

71.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to Prudential; (iv) all parties who are known to possess or assert a secured claim against the Stalking Horse Assets and Non-Stalking Horse Assets; (v) counsel to the Buyer; (vi) the Internal Revenue Service; and (vii) all parties entitled to notice under Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests (A) entry of the proposed Kansas City Sale Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, (B) entry of the proposed Kansas City Sale Order, substantially in the form attached hereto as <u>Exhibit C</u>, and (C) such other and further relief as the Court deems just and proper.

Dated: July 1 , 2008
        Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____
Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
Nathan D. Grow (No. 5014)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

Proposed Counsel for the Debtors and
Debtors in Possession